UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CINDY ARMSTRONG,

               Plaintiff,                            Case No. 05-71603

vs.

                                              HONORABLE DENISE PAGE HOOD
                                              HONORABLE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____/

**REPORT AND RECOMMENDATION**

## I.     BACKGROUND

Cindy Armstrong brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that this matter be REVERSED AND REMANDED FOR RECONSIDERATION.

### A. PROCEDURAL HISTORY

Plaintiff applied for DIB on June 5, 2001, alleging that she was disabled as of October 31, 2000. (R. 20, 21). After Plaintiff's application was initially denied, she had a January 9, 2003, hearing before administrative law judge (ALJ) William J. Musseman who issued a decision on February 12, 2003, finding Plaintiff not to be entitled to a period of disability. (R. 20 - 30). On February 4, 2005, the Appeals Council denied Plaintiff's request for review. (R. 5 - 7).

### B. BACKGROUND FACTS

### 1. PLAINTIFF'S HEARING TESTIMONY

At her January 9, 2003, hearing in front of Administrative Law Judge ("ALJ") William J. Musseman, Plaintiff testified that she was married with a 17 year old son who lives at home with her. (R. 374). Plaintiff completed the 12th grade but had no further education or training. (R. 375). Plaintiff has worked as an assembly sorter, parts crimper and material handler. (R. 97, 375). She stopped working in May 2000 and could not return to any of her previous jobs because the repetitive gripping and lifting are too difficult because her "hands are bad." (R. 375 - 376). She further testified that she went back to work briefly in May and again for a few hours in October. (R. 376 - 377).

Plaintiff had surgery for carpal tunnel syndrome twice on each hand and had an elbow release on the right elbow yet, she still experiences numbness, drops things, her fingers turn white and then black, and has trouble grabbing and opening things. (R. 378). Plaintiff's biggest problems are currently her left ring finger, just below the palm of her right hand, and her left elbow (on which she has not had surgery). (R. 378 - 379). Plaintiff described her elbow pain: "it's like deep inside nagging toothache pains that go down my hands... And then like if I go to reach for stuff I have like electricity that goes up to [my shoulder]. (R. 379 - 380). Plaintiff also has pain in her left shoulder, that causes problems when she lifts her arm over her head, and neck pain "like a constant grinding like bone on bone." (R. 380 - 381). Turning her neck back and forth and tilting it up and down as well as holding it still for a period of time causes pain. (R. 381). Plaintiff is also affected by fibromyalgia which it affects her at her wrists, elbows, shoulders, the front of her knees and her ankles. (R. 382). Plaintiff stated that she receives some relief from hot baths, "[h]eating pads, hot shots, deep heat." (R. 383). Plaintiff testified

that she no longer takes Prednisone and now takes Bextra for her fibromyalgia.  (R. 384).

Plaintiff recently had surgery to remove a bunion that had been causing her pain for years.  (R.

384 - 385).

Plaintiff was also seeing a doctor for depression and testified that she still has crying

spells a couple of times a month when she thinks about what she has been through.  (R. 386).

Plaintiff can bathe, dress, comb her hair, and make her bed, but needs help with cooking (lifting

pots or pans or peeling potatoes) because of her hands (R. 397 - 388).  Plaintiff shops with

assistance, needing someone to help with the lifting and carrying (R. 388). She has had to give

up some activities (like walking and bowling) yet she still likes to read magazines and novels

and she still goes to church (Tr. 389).

Plaintiff testified that she sleeps around five hours per night; can sit still comfortably for

20 minutes; can stand comfortably for five minutes; can only walk very short distances ("Half a

block maybe I could"); and can lift small light objects for a very short period of time.  (R. 391).

Plaintiff receives $2,033 per month from her pension but no worker's compensation

because he workers compensation claim is currently pending in litigation.  (R. 393).

### 2. MEDICAL EVIDENCE

On March 3, 1995, neurologist Wilbur J. Boike, M.D., reported that an

electromyographic examination he performed on Plaintiff was "abnormal" with subtle

electrodiagnostic evidence of mild median neuropathies at both wrists but no evidence of actual

axonal degeneration and no electrodiagnostice evidence of a cervical radiculopathy affecting

either upper extremity.  (R. 98).

Plaintiff saw Dr. Mark Pankonin on May 30, 2000, for complaints of bilateral elbow

pain, left shoulder pain and generalized body aches. (R. 127). Dr. Pankonin's impression was bilateral elbow lateral epicondylitis, left shoulder rotator cuff tendinitis, generalized myalgia and arthralgias possibly secondary to rheumatoid arthritis. Dr. Pankonin started Plaintiff on elbow injections, injecting her right elbow with 60 mg of Depo-Medrol and 1 cc of Xylocaine. (R. 128).

On June 26, 2000, Plaintiff went to Saginaw Psychological Services reporting that she was suffering from depression and had stress at work. (R. 102, 106, 117). She was already taking medication for depression at that time (see Tr. 125). Kurt Briggs, who completed the interview, reported that Plaintiff was crying during the interview and appeared distressed. (R. 102). Mr. Briggs reported that plaintiff's mood was anxious and depressed, but he also stated that she showed no signs of anxiety and that her affect (emotional responsiveness) was appropriate. (R.103). Mr. Briggs observed that evaluation of Plaintiff's cognitive processes indicated that her concentration and attention skills were mildly impaired and her thought process was characterized by circumstantial thinking with some indications of delusional thinking involving persecution. (R. 103). Mr. Briggs found Plaintiff competent to manage her own affairs and diagnosed Major Depressive Disorder, recommending therapy (R. 104 - 105).

On July 13, 2000, Plaintiff saw Dr. Michael G. Sandborn on the referral of Dr. Pankonin. (R. 124, 128). Dr. Sandborn noted that Plaintiff was about 30% improved with her right elbow and almost back to baseline with her left shoulder (following injections). (R. 125). He assessed Plaintiff to have total body pain, insomnia, possibly fibromyalgia and depression. (R. 126). Dr. Sandborn recommended a home stretching program, a general aerobic fitness program, electrical stimulation and prescribed Ambien for her insomnia. (Id.).

4

Plaintiff saw Dr. Sachin Nagarkar, a psychiatrist, on July 18, 2000, and reported that she had been harassed at work. (R. 129). On Monday mornings, when returning to work, Plaintiff would find her desk and work area defaced with spit chewing tobacco, cigarette butts, apple cores and banana peels. There would be footprints on the furniture, evidencing that someone had climbed over the partition and climbed on her furniture. Her desk and cabinets had been glued shut; plants and vases had been destroyed; and objects (like fans and mirrors) were stolen. On May 12, 2000, she had come into the office to find her work area "totally trashed." Plaintiff went home because she was tired of people telling her to be "tough." Plaintiff reported that her work situation had affected her mood, and she frequently cried. Plaintiff has a history of some depression in her family and suffers from bulimia. (R. 130). Dr. Nagarkar diagnosed Major Depression – Recurrent. (Id.). He encouraged her to continue her therapy sessions with Mr. Briggs, and changed her medication from Zoloft to Prozac. (R. 131).

On a August 21, 2000, visit to Dr. Thomas H. Beird, Plaintiff complained of recurrent numbness, tingling, prickling, and aches in the median distribution of both hands daily. (R. 153). Dr. Beird's impression was "bilateral carpal tunnel syndrome, right D2 and D3 trigger fingers, bilateral FCR, de Quervain's, first CMC joint arthritis, and lateral epicodylitis." He recommended surgery.

On August 30, 2000, Dr. Nagarkar noted that, "so far so good, work's been okay" notwithstanding Plaintiff's report that she had brought some flowers into work and someone apparently pulled off every petal. (R.280). Plaintiff had been bingeing and purging a little. On September 5, 2000, Plaintiff reported returning to work after the holiday weekend and found her area was trashed again. She said her "nerves were shot," and Dr. Nagarkar put her on sick leave

5

(Id.).  The next day, plaintiff showed Dr. Nagarkar pictures of her work station, and the doctor verified that there were bags of gloves strewn all over the floor, in addition to a banana peel. Plaintiff went to the union committee person, but he was reluctant to do anything, so she had to go to the shop committeeman, who advised her to file a grievance.

On September 6, 2000, Dr. Gavin I. Awerbuch conducted nerve conduction studies which indicated mild bilateral carpal tunnel syndrome.  Dr. Awerbuch noted that Plaintiff complained of elbow pain and numbness of her 5th digits, but he could not identify a significant ulnar neuropathy.  (R. 132).

On September 27, 2000, Dr. Beird, while again encouraging surgery reported: "Despite the fact that her EMGs are mild, her symptoms are rather exquisite."  (R. 153).

During three visits from October 10, 2000, to March 6, 2001, Dr. B. Tharaknath Rao, remarked that Plaintiff had tenderness over the majority of the fibromyalgia and multiple areas in her left trapexius muscle that were tender to palpation.  (R. 154 - 158).  At the latter exams (after the surgery noted below), Dr. Rao observed that Plaintiff appeared "well and in no distress."  (R. 154, 155).

An October 30, 2000, body bone scan was normal with no evidence of any joint inflammation.  (R. 182).

On November 2, 2000, Dr. Beird performed a left carpal tunnel release.  (R. 137 - 140). On November 30, 2000, Dr. Beird performed a right carpal tunnel release.  (R. 141 - 144).  On January 8, 2001, after persistent and continued severe pain in the right lateral epicodylar region Plaintiff was given a steroid injection of 1 cc of 40 mg/cc Kenalog.  (R. 152).

On February 13, 2001, Dr. Brian C. De Beaubien noted that Plaintiff had pain with

passive and active range of motion of the left shoulder and his impression was rotator cuff

tendinitis.  (R. 161).  An April 14, 2001, MRI of Plaintiff's left shoulder showed slight signal

heterogeneity in the supraspinatus tendon consistent with tendiopathy but no suggestion of a

rotator cuff tear and no soft-tissue or marrow signal abnormalities.  (R. 159).

In May 2001, Dr. Nagarkar noted that Plaintiff's medication had helped her bulimia, but

her self esteem had worsened because she was up to 250 pounds (Tr. 282).

Plaintiff saw Dr. Richard W. Lingenfelter for a consultation for her left shoulder rotator

cuff tendinitis.  (R. 268 - 271).  Dr. Lingenfelter's diagnoses was: chronic left shoulder pain,

neck pain, history of heart palpitations, history of heart murmur and history of questionable

rheumatoid arthritis.  (R. 271).  On September 21, 2001, Dr. Lingenfelter operated on Plaintiff

performing a Fluroscopically guided left C5 - C6 - C7 facets via the medial branch nerve and a

trigger point injection, left trapezius.  (R. 259).

On October 3, 2001, Plaintiff, gave three left upper thoracic trigger point injections by

Dr. Michael D. Papenfuse.  (R. 250).  On October 17, 2001, and again on January 8, 2002, Dr.

Papenfuse gave Plaintiff injections in the left C5 - C6 and left C6 - C7 cervical facet joints.  (R.

219, 238).  On January 22, 2002, Plaintiff followed up with Dr. Papenfuse, complaining of neck

pain, right shoulder pain and scapula pain.  (R. 214).  After examination, Dr. Papenfuse

diagnosed her with chronic neck pain and left scapular/shoulder pain secondary to a left cervical

facet syndrome.

Dr. Lingenfelter performed a Fluoroscopically-guided radio frequency thermocoagulation

of the left C5, C6 and C7 facets via the medial branch nerves and a trigger point injection of the

left infraspinatus muscle on March 7, 2002.  (R. 310).  Dr. Lingenfelter performed another

trigger point injection of Plaintiff's left infraspinatus muscle on March 12, 2002.  (R. 308).
Plaintiff visited Dr. Lingenfelter again on March 22 and April 9, with the doctor diagnosing her
with chronic neck pain and left shoulder pain.  (R. 315, 324).

On April 12, 2002, Plaintiff was seen by Dr. Vladimir Ognenovski at the University of
Michigan.  He found no objective evidence of inflamatory arthropathy or myopathy.  Noting
Fibromyalgia with ongoing symptoms and a bunion on her right MTP joint.  (R. 332).

Plaintiff again saw Dr. Lingenfelter on October 29, 2002, at the Pain Management Clinic.
She reported significant improvement in her neck and shoulder which bothered her only when
pressure is applied to the left side of her neck.  He diagnosed her with chronic neck pain and left
shoulder pain secondary to facet syndrome, improved with treatment.  (R. 364).


### 3. VOCATIONAL EVIDENCE

Mary Williams testified as a Vocational Expert ("VE") on January 9, 2003.  (R. 394).
ALJ Musseman asked Ms. Williams to consider a hypothetical individual with the same age and
educational background as the Plaintiff who could do sedentary work with no work over chest
level; no repetitive reaching; no assembly line-type work with her upper extremities; no
repetitive gripping or grasping with force; no work in extremes of cold temperature; and no
repetitive turning or flexing of the neck.  (R. 396).  Ms. Williams testified that, with these
limitations, plaintiff could not perform any of her past work but could perform other unskilled
work in the lower peninsula of Michigan.  (R. 398).  These included 1,785 low stress visual
inspection jobs, 1,575 surveillance system monitor jobs, and 1,785 jobs as an information clerk
in the region (Id.).  A second hypothetical with the same restrictions with the additional

requirement of needing to elevate ones feet and legs to heart level for at least 20 minutes at an

unpredictable basis would preclude all employment.  (R. 398).

### 4. THE ALJ'S DECISION

ALJ Musseman found that Plaintiff met the disability insured status requirements for a

period of disability and DIB and is insured for benefits through the date of his decision.  Plaintiff

had not engaged in substantial gainful activity since the alleged onset date.  (R. 29).

ALJ Musseman found that Plaintiff had severe impairments involving chronic left

shoulder pain, bilateral carpal tunnel syndrome, cervical spine pain, plantar fascitis and bilateral

elbow pain.  These impairments did not meet or equal one of the listed impairments in Appendix

1 to Subpart P, Regulations No. 4.  (Id.).  ALJ Musseman also found the Plaintiff's allegations

regarding her limitations to lack credibility.

Based on consideration of the record ALJ Musseman found that Plaintiff had a residual

functional capacity to perform a limited range of sedentary work lifting no more than 10 pounds

at a time and occasionally lifting or carrying other lighter items.  She cannot do any work above

chest level, cannot repetitively reach, grip or grasp with force.  She cannot do assembly line

work, turn or flex her neck, or have exposure to temperature extremes.  (Id.).

ALJ Musseman also found that the Plaintiff falls in the "younger" category and has a

high school education.  (R. 30.)  She was found unable to perform any of her past relevant work

and has no transferable skills.  Using Medical-Vocational rule 201.27 as a framework for

decision-making ALJ Musseman found that even with the Plaintiff's limitations, there are still "a

significant number of jobs in the national economy that she could perform," including those

identified by VE Williams (Id.).  Therefore, the Plaintiff was not disabled under the Social

9

Security Act at any time through the date of this decision.

## II.   ANALYSIS

### A. STANDARDS OF REVIEW

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than their past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[1]  A response to a flawed hypothetical

---

[1] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B. FACTUAL ANALYSIS

Plaintiff challenges the Commissioner's decision arguing that ALJ Musseman erred by forming an inaccurate hypothetical that did not accurately portray Plaintiff's impairments, specifically the severe impairment of her Major Depressive Disorder.  In the present case, there are two issues.  First, whether ALJ Musseman gave adequate reasons for discounting the evidence from Plaintiff's treating psychiatrist, Dr. Nagarkar, and also in discounting the state agency psychiatric evaluator, Dr. Robert  Newhouse.  The second question is whether the ALJ adequately considered Plaintiff's mental limitations in questioning the vocational expert.

(1) Background on Mental Impairments:

In evaluating psychiatric impairments, 20 C.F.R. § 404.1520a(e)(1) requires consideration, of activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  This is generally done in a Psychiatric Review Technique Form (PRTF).

20 C.F.R. §§404.1520a(c)(1) requires consideration of "all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment".[2]  In addition, under §404.1520a(c)(2) the decision maker must consider the extent to which the mental impairment interferes with an "ability to function

---

[2] 20 C.F.R.  §404.1545(c)  requires consideration of "residual functional capacity for work activity on a regular and continuing basis" and a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting."

independently, appropriately, effectively, and on a sustained basis" including "such factors as the quality and level of [ ] overall functional performance, any episodic limitations [and] the amount of supervision or assistance [ ] require[d]."

Prior to October 2000, the PRTF was completed at the state agency level and also a form was completed by the ALJ and attached to the decision. 20 C.F.R. §404.1520a used a 5-category scale (never, seldom, often, frequent, and constant) on the PRTF for the first three of these four functional areas including the effect of a claimant's mental deficiencies of concentration, persistence, or pace.

In *Bankston v. Comm'r of Soc. Sec.*, 127 F. Supp. 2d 820 (E.D. Mich. 2000), this court noted that it was reasonable to conclude under the regulations "that a mental deficiency occurring 'often' may not be consistent with substantial gainful employment." *Bankston*, 127 F. Supp. 2d at 826.

SSA revised its regulation so the current categories for the first three of these four functional areas are now: None, Mild, Moderate, Marked and Extreme. 20 C.F.R. §404.1520a(c)(4) and §416.920a(c)(4).

In addition, the September 2000 amendments to the regulations modified 20 C.F.R. §404.1520a(e)(2) to no longer require the ALJ to complete and attach a PRTF. Instead, the ALJ in the decision:

> must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

(20 C.F.R. §404.1520a(c) and §416.920a(c) include daily living; social functioning;

concentration, persistence, or pace; and episodes of decompensation.)

(2.)  <u>ALJ Musseman 's Treatment of Mental Evidence:</u>

Under 20 C.F.R. § 404.1502 Dr. Nagarkar qualifies as a treating physician.  He

diagnosed Plaintiff with  Major Depression – Recurrent, put her on sick leave, urged her to

continue her therapy sessions with Mr. Briggs, and changed her medication from Zoloft to

Prozac.  (R. 131). Generally, treating physician's opinion should be given greater weight. [3]  If an

ALJ does not give weight to a treating physician in the context of a disability determination, the

ALJ must "give good reasons" for not doing so.  *Wilson v. Commissioner of Social Security,* 378

F.3d 541, 544-45 (6th Cir. 2004).[4]  Here, ALJ Musseman did not give greater weight to the

---

[3] *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

[4] In August 1991, the Social Security Administration adopted a new regulation in response to the treating physician rules adopted by the various circuits.  20 C.F.R. § 1527 [SSI § 416.927] (amended in 1997).  The 6th Circuit discussed the treating source regulation in *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004):

> The regulation requires the agency to "give good reasons" for not giving weight to a treating physician in the context of a disability determination. 20 C.F.R. § 404.1527(d)(2) (2004). This requirement is part of the "treating source" regulation adopted by the Social Security Administration in 1991. See generally *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998).

> Pursuant to this regulation, an ALJ must give more weight to opinions from treating sources since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

> 20 C.F.R. § 404.1527(d)(2). An ALJ must give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." Id. If the opinion of a treating source is not

findings of Plaintiff's treating therapist, Dr. Nagarkar.  ALJ Musseman noted that Plaintiff saw

psychiatrist Dr. Nagarkar on July 18, 2000, and a therapist from July 2000 through May 2001,

but did not mention that Plaintiff continued to see Dr. Nagarkar, seeing him several times from

July 2000 thorough February 2002.  (R. 22, 280 - 284).  While ALJ Musseman acknowledged

the diagnosis of major depression, he concluded:

> While the claimant has been attending psychotherapy for crying spells, there is
> nothing in her records that would limit her, other than to unskilled work, as a
> result of a mental impairment.  She testified that she liked to read which indicated
> she was able to concentrate, which was also demonstrated during her testimony at
> the hearing.

(R. 25).

ALJ Musseman also addresses the PRTF acknowledging that the State Agency

psychologist, Dr. Robert Newhouse, "assessed the claimant as having an affective disorder, more

specifically a depressive disorder."  (R. 25, 199 - 212 referring to R. 202).  ALJ Musseman

further noted that the State Agency psychologist concluded that Plaintiff had mild restrictions of

activities of daily living, moderate difficulties in maintaining social functioning, concentration,

persistence or pace.  (Referring to R. 209).  As noted above, this "moderate" categorization was

the middle of five choices as was "often" under the old regulation.  Thus, as in *Bankston*,

moderate limitations of concentration, persistence or pace would trigger concerns about mental

deficiencies affecting RFC to the extent that consideration of the vocationally relevant mental

---

accorded controlling weight, an ALJ must apply certain factors--namely, the length of the
treatment relationship and the frequency of examination, the nature and extent of the
treatment relationship, supportability of the opinion, consistency of the opinion with the
record as a whole, and the specialization of the treating source--in determining what
weight to give the opinion. Id.

*Wilson*, 378 F.3d at 544.

limitations need be addressed with the vocational expert.

Yet, rather than adopt the state agency's PRTF, ALJ Musseman dismissed Dr. Newhouse's assessment noting that the opinion was "inconsistent with the record as a whole," and "therefore given reduced weight."  (R. 26).  Instead of Dr. Newhouse's finding of  moderate limitations of concentration, persistence or pace, ALJ Musseman finds that "[t]he record when considered in its entirety establishes that the claimant has mild to moderate difficulties in maintaining concentration, persistence or pace." (R. 26).   ALJ Musseman concludes that"[t ]he medical evidence taken as a whole does not establish that the claimant's mental impairments have caused more than a minimal limitation of ability to do basic work activities."  (R. 27).[5]

Yet, these conclusory statements using only general statements like considering "the record as a whole" do not identify any counter-evidence or professional opinion that is inconsistent with (1)  the opinion of Dr. Nagarkar as to Plaintiff's severe mental condition for which he placed her on sick leave, prescribed medication and counseling, or (2) with the evaluation of Dr. Newhouse that Plaintiff has "moderate", not "mild to moderate" difficulties in maintaining concentration, persistence or pace."   Without a more detailed explanation of the reasoning for discounting these two doctors, this Court cannot do an adequate review for sufficiency of the evidence.[6]  Nor can an ALJ summarily reject medical evidence without explanation and substitute his own judgment for that of a treating or even a consulting physician.

_____

[5]  He also asserts that "[s]he testified that she liked to read which indicated that she was able to concentrate, which was also demonstrated during her testimony at the hearing (R.25). She noted she read as a hobby (R.389), but earlier indicated confusion while reading (R. 26).

[6]  *Cf. Brown v. Bowen*, 794 F.2d 703, 708 (D.C. Cir. 1986) stating "The judiciary can scarcely perform its assigned review function, limited though it is, without some indication not only of what evidence was credited, but also whether other evidence was rejected rather than simply ignored."

*Clifford v. Apfel*, 227 F.3d 863 at 871 (7th Cir. 2000), (noting that an ALJ may not "substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record"), *Rosado v. Secretary of HHS,* 807 F.2d 292, 293-94 (1st Cir. 1986)(An ALJ's own judgment cannot substitute for an uncontroverted medical opinion).

Without further explanation or justification for discounting the opinions of Dr. Nagarkar and Dr. Newhouse, this Court must treat the evidence as establishing that Plaintiff has moderate limitations of concentration, persistence or pace.

(3) <u>Sufficiency of the Hypothetical Question:</u>

A hypothetical question must precisely and comprehensively set out every physical and mental impairment of the applicant that the ALJ accepts as true and significant. *Varley v. Secretary of HHS*, 820 F.2d 777, 779 (6th Cir. 1987) ("Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [plaintiff's] individual physical and mental impairments'").

In cases using the pre-October 2000 PRTF and those with the new procedure incorporating the new scale for the four functional areas in the ALJ's decision, when there are findings of "often" or "moderate" difficulties in maintaining concentration, persistence or pace claimant's challenged the hypothetical question to the vocational expert if it did not incorporate such findings.

Under the old rules the Sixth Circuit in *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), had the *Bankston* type argument made to it. The Court held that an ALJ's failure to include in a hypothetical question a PRTF finding that a claimant "often" has difficulty

concentrating is not a basis for remand when the hypothetical question adequately describes that claimant's limitations arising from a mental impairment.  In *Smith*, the ALJ marked on the PRTF that Smith "often" suffered deficiencies of concentration, persistence or pace, but did not include that finding in the hypothetical question to the VE. Plaintiff Smith, relying on cases similar to *Bankston*, argued for a remand based on that omission.  While not specifically mentioning the claimant often having deficiencies in concentration, the ALJ did incorporate into his hypothetical question "restrictions against quotas, complexity, stress, etc."  The Sixth Circuit, without citing *Bankston,* held that the hypothetical question asked by the ALJ was adequate.  The court noted that while the ALJ checked a single box for "often" in a 1-5 rating scale on the PRTF,

> the ALJ went beyond this simple frequency assessment to develop a complete and accurate assessment of Smith's mental impairment ....  In particular, the ALJ relied on the testimony of four physicians who characterized Smith's concentration problems as minimal or negligible.  The ALJ then translated Smith's condition into the only concrete restrictions available to him–examining psychiatrist Schweid's recommended restrictions against quotas, complexity, stress, etc.– and duly incorporated them into his hypothetical to the vocational expert.

*Id.* at 379.[7]

The Court distinguished several unpublished district court cases similar to *Bankston* because the ALJ's in those cases did not include the finding that the claimant "often" had difficulty concentrating, nor did they otherwise account for such a limitation.  *Id.*  Thus, when the ALJ makes a PRTF finding that the claimant "often" has or has "moderate" deficiencies in concentration, persistence or pace, but does not specifically include such limitation(s) in the hypothetical question, the question is whether the ALJ used adequate alternate concrete job

---

[7] It seemed significant to the court in *Smith* that the ALJ had noted there were four physicians who characterized Smith's concentration problems as minimal or negligible.  In many cases the ALJ will have less weighty counter-evidence concerning the degree of concentration limitations than in *Smith*.

restrictions in the hypothetical question that suitably accommodated the worker's concentration limitations.

One court has held that a reference merely to "simple jobs" or "unskilled sedentary work" in a hypothetical question is insufficient to describe and accommodate concentration deficiencies. *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996). In *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d. Cir. 2004), the ALJ had included the following limitations in the hypothetical: "no more than simple one or two-step tasks; no travel outside the workplace; and a reasonable opportunity to receive and make personal telephone calls", which the Court felt failed to "take into account the ALJ's own observation (both in her opinion and in the PRTF) that [claimant] often suffered from deficiencies in concentration, persistence, or pace." *McGuire v. Apfel*, 1999 WL 426035, at *15 (D. Ore. 1999), held that "simple work" was insufficient to describe claimant's deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner). *Keyser v. Barnhart,* No. 03-60078 (E.D. Mich., Sept. 2, 2004) (unpublished), held that a hypothetical question of "unskilled jobs with a low stress level alone" is not sufficient to accommodate a claimant who, under the Commissioner's new regulations, has "moderate limitations with respect to concentration, persistence or pace." *Walker v Barnhart*, 258 F. Supp.2d 293 (E.D. Mich. 2003), held that the ALJ's hypothetical question to the VE that the claimant could perform only simple, unskilled work did not necessarily take into account the non-exertional limitations imposed by Plaintiff's depressive disorder. *Bielat v Commissioner,* 267 F. Supp.2d 698 (E.D. Mich. 2003), held that generally, a reference to "unskilled, sedentary work" is not sufficient to describe deficiencies in concentration.

In the present case, ALJ Musseman's only factor related to any mental limitations was

eliminating "assembly line" work (albeit not all quotas).  The VE responded to the question

identifying inspection, surveillance, referral and information clerk jobs, clarifying that these

were unskilled.  (R 397-98).   Here we do not have "testimony of four physicians who

characterized Smith's concentration problems as minimal or negligible" as in *Smith* nor any

other portions of the hypothetical question that would meet the *Smith* standards for adequately

accommodating moderate limitations of concentration, persistence or pace.

Accordingly this matter should be reversed and remanded for further administrative

proceedings consistent with this Report and Recommendation.

On remand, ALJ Musseman must provide sufficient reasons to reject the opinions of Dr.

Nagakar and Dr. Newhouse, or alternatively deal with Plaintiff's moderate limitations of

concentration, persistence or pace or other vocationally significant mental limitations in his

hypothetical question to the vocational expert.  In doing so, ALJ Musseman may develop the

record as appropriate, and he may find that he needs more information from Dr. Nagakar, in

which case he should attempt to recontact him in accordance with SSR 96-5P.[8]

---

[8] Requirements for Recontacting Treating Sources

Because treating source evidence (including opinion evidence) is important, if the
evidence does not support a treating source's opinion on any issue reserved to the
Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case
record, the adjudicator must make "every reasonable effort" to recontact the source for
clarification of the reasons for the opinion.

SSR 96-5P

Like SSR 96-5p on Medical Source Opinions, SSR 85-16 also urges recontacting treating sources:
On occasion, the report of a current treating source may disclose other sources of medical
evidence not previously report. If so, these sources should be contacted, since it is
essential that the medical documentation reflect all available sources, particularly in
instances of questionable severity of impairment or inconclusive RFC. When medical
source notes appear to be incomplete, recontact with the source should be made to
attempt to obtain more detailed information. Every reasonable effort should be made to

**III.    RECOMMENDATION:**

Accordingly, for the above stated reasons IT IS RECOMMENDED that this matter be

REVERSED AND REMANDED FOR RECONSIDERATION.

The parties to this action may object to and seek review of this report and

recommendation, but are required to act within ten (10) days of service of a copy hereof as

provided for in 28 U.S.C.. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific

objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140

(1985);  *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638

F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others

with specificity, will not preserve all the objections a party might have to this report and

recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served

upon this magistrate judge. Within ten (10) days of service of any objecting party's timely filed

objections, the opposing party may file a response.  The response shall be not more than twenty

(20) pages in length unless by motion and order such limit is extended by the court.  The

response shall address specifically, and in the same order raised, each issue contained within the

objections.

Dated: May 12, 2006                               s/Steven D. Pepe
Ann Arbor, Michigan                               UNITED STATES MAGISTRATE JUDGE

---

obtain all medical evidence from the treating source necessary to make a determination of
impairment severity and RFC before obtaining evidence from any other source on a
consultative basis. However, when treating medical sources cannot provide essential
information, consultative examination by a treating or nontreating source may resolve the
impairment or RFC issue.  Similarly, when the reports from these sources appear to be
incomplete, the source should be recontacted to clarify the issues.

<u>Certificate of Service</u>

     I hereby certify that a copy of this Report and Recommendation was served upon the attorneys of record by electronic means on May 12, 2006.

<u>s/William J. Barkholz   </u>
Courtroom Deputy Clerk
